Edwin Gomez, Jr., and Others, Appellants, *v.* Horatio Gomez, Respondent.

*Testamentary trustee — action by certain of the* cestuis que trustent *to compel an accounting — costs — contribution should not be enforced from other* cestuis que trustent *who are not parties thereto — duty as to asserting title in a street — when a renewal of a lease by a trustee to the detriment of the income of the life tenants is justified — omission of a trustee to advertise and employ real estate agents for ruinous buildings.*

Where, in an action brought by certain of several *cestuis que trustent* to compel an accounting by the defendant, as trustee under a will, which action proceeded wholly in the plaintiffs' interest, the other *cestuis que trustent*, who did not choose to become parties to the action, and did not participate in the benefits thereof, cannot be forced to contribute to the expenses of the action; and where it appears, upon appeal, that the plaintiffs have succeeded in surcharging the defendant's accounts to the extent of nearly a thousand dollars, an award of costs to him will be stricken out.

A trustee should not be held liable for not asserting title to land in an unestab-lished street bordering upon property to which he holds the title, or for com-promising a dispute in reference thereto, with a party claiming to occupy it in hostility to the rights of the trust estate, instead of continuing the prosecution of an ejectment suit for its recovery, where such street has never had a moment of actual existence, and where, had the land been recovered, it is questionable whether it could have been made a source of revenue, inasmuch as it was set apart for street uses, and could not, therefore, be lawfully utilized in any manner that would diminish the *quantum* of light and air which it would furnish if retained as a street, and where the trustee has been advised by competent counsel not to press such action of ejectment to trial.

A trustee will not be personally charged with damages on the ground that he has wastefully and improvidently granted a renewal of a lease, the obligation to renew which could have been avoided by the payment to the lessee of the value of improvements made upon the land, on the theory that the trustee could have bought the improvements at a low figure and then have leased the property at rents that would have added largely to the income of the estate, where it appears that the trustee had no money of the estate with which to purchase such improvements, and had, at the time (prior to the passage of chapter 275 of the Laws of 1882), no authority to mortgage the fee or even the trust estate for the purpose of buying the improvements.

*Semble,* that, even if the trustee had had power to raise money upon mortgage for such a purpose, it is questionable whether he would have been justified in doing so, and thereby increasing the income of the holders of life interests at the expense of those who were to succeed to the fee of the trust estate.

A trustee will not be held negligent to a degree that will fasten upon him lia-bility for a loss, at best speculative, by reason of his not having secured a larger rent, in consequence of his omission to advertise and employ real estate agents for old buildings in a dilapidated, worn-out and irreparable condition, and occupied by a very low order of tenants, which buildings, although the rent was proportioned to their ruinous condition, were never vacant, it being improb-able, in the lethargic condition of the market, that a tenant, able and willing to pay a larger rent and improve the property could have been found, and where the power to lease for a term of years was doubtful.

APPEAL by the plaintiffs, Edwin Gomez, Jr., and others, from portions of a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 18th day of March, 1898, upon the report of a referee appointed to take and state the account of the defendant as trustee under the last will and testament of Hetty Gomez, deceased.

*Hector M. Hitchings,* for the appellants.

*Michael H. Cardozo* and *Edgar J. Nathan* for the respondent.

BARRETT, J.:

We quite concur in the disposition of this case made by the learned referee, and in the reasons given therefor in his full and careful opinion.

The only question which we think needs special consideration relates to the award of costs. The defendant is allowed the sum of $2,642.56 for his costs and extra allowance. The judgment directs that from this amount the sum of $968.63, ordered to be paid to the plaintiffs by the defendant, shall be deducted, and that the balance, together with the plaintiffs' costs, amounting to $951.06, shall be charged against the share of the estate held in trust for Edwin Gomez, Sr., the plaintiffs' father and assignor.

By the interlocutory judgment, from which no appeal was taken, costs were awarded to the plaintiffs, and the question whether such costs should be paid out of the estate or by the defendant personally was left for future decision. We think that the trust estate referred to must be deemed to be that part of the whole trust estate belonging to the plaintiffs. This was the only estate before the court or subject to its decree. None of the other *cestuis que trust* made themselves parties to the action. It proceeded wholly in the plaintiffs' interest, the sum recovered from the defendant being awarded to them. The other *cestuis que trust* cannot be forced to contribute to the expenses of an action to which they did not choose to become parties, and in the benefits of which they have not participated. We agree with the referee that the defendant should not be compelled to pay these costs personally, and, hence, affirm that part of the judgment charging them against the plaintiffs' share.

But we think that the award of costs to the defendant should be stricken out. The plaintiffs have succeeded in surcharging his accounts to the amount of nearly $1,000, and under such circumstances it would certainly be a hardship to allow him costs against the plaintiffs personally. Yet that is what is practically done when the costs are charged against their share of the estate.

The judgment should be modified by striking out the award of costs to the defendant, and as so modified it should be affirmed, without costs of this appeal to either party.

VAN BRUNT, P. J., RUMSEY, PATTERSON and O'BRIEN, JJ., concurred.

Judgment modified by striking out award of costs to defendant, and as so modified affirmed, without costs of appeal to either party.

The following is the opinion of the referee referred to in the opinion of BARRETT, J.:

GEORGE M. VAN HOESEN, Referee:

Having been appointed by the interlocutory judgment, entered on June 1, 1892, in this action, referee:

1. To take and state the accounts of the defendant, Horatio Gomez, as testamentary trustee under the last will and testament of Hetty Gomez, deceased;

2. To take such testimony as might be offered by the parties relating to alleged losses of money by said trustee;

3. To take such testimony as might be offered by the parties relating to the waste, mismanagement, improper conduct, improper expenditures by said trustee of moneys had and received by him to and for the use of the beneficiaries under the will of said Hetty Gomez, deceased, and not accounted for, and any other matter with which he may be chargeable;

4. To report the acts relating to said accounts and said alleged misconduct, with my opinion thereon;

5. To report whether, in my opinion, the defendant is a proper and suitable person to continue as trustee under the will of Hetty Gomez, or whether he should be removed; and

6. To report whether the expenses of the accounting by said trustee should be borne by the trustee individually or be paid out of the trust estate, and having performed, according to the best of my ability, the duties devolved upon me by said interlocutory judgment, I respectfully submit this my report of my proceedings in the premises.

Before taking any testimony, I took the oath prescribed by section 1016 of the Code of Civil Procedure, which oath is annexed to a copy herewith submitted of said interlocutory judgment.

At all the hearings before me the plaintiffs were represented by their counsel, Hector M. Hitchings, Esq., and the defendant was represented by his counsel, Messrs. Michael H. Cardozo and Edgar J. Nathan.

Though the interlocutory judgment requires that such testimony

as may be offered by either party shall be taken, the plaintiffs and the defendant united in requesting rulings by the referee upon objections to the admissibility of evidence offered, and rulings were accordingly made by me, the same as if a trial of the issues in the action had been in progress.

The defendant presented his account with the vouchers and the plaintiffs then made twenty-one objections thereto, but subsequently determined to press only eight of those objections. Except as their correctness may be impeached by some one or more of those eight objections, it was conceded that the accounts should stand as presented by the trustee. Those eight objections were examined and disposed of by me in the following manner:

Objection No. 12 is the following: "The trustee must be personally charged with the sum of $14,000 and interest from February, 1865, moneys lost to the estate by the failure of the trustee to recover the property Number 7 Bank street, New York, for the estate; and the income of the estate increased by said amount."

The plaintiffs contend that No. 7 Bank street was a part of the trust estate devised by the will of Hetty Gomez, and that the defendant negligently suffered one McLachlan and his heirs to hold and occupy it in hostility to the rights of the trust estate, which it was his duty as trustee to assert and enforce, and that through such negligence the property was wholly lost to the trust estate.

No. 7 Bank street was never conveyed *in totidem verbis* to Hetty Gomez. The land now known as No. 7 Bank street is the easterly half of a strip of land that was for a time called Factory street, but was also called Catherine street. It was never opened, used or worked as a street or public highway. One Abijah Hammond caused a map to be made of certain property of his, and in that map there is a street called Factory street, which embraces the land now known as No. 7 Bank street. Except that map and descriptions in certain deeds, there is nothing to show that there ever was, even in contemplation, a street where the building known as No. 7 Bank street now stands. There was a conveyance to Hetty Gomez of the land now known as No. 3 and No. 5 Bank street, and it is contended by the plaintiffs that that conveyance carried with it the fee to the *medium filum viæ* called Factory street, because that street is herein named as the westerly boundary of No. 5 Bank street. The conveyance

FIRST DEPARTMENT, OCTOBER TERM, 1898. [Vol. 33.

just mentioned thus describes the property : " Beginning in the corner formed by the intersection of Bank street and Greenwich Lane; thence running northerly on Greenwich Lane, One hundred and ninety-six feet to Scott street; thence westerly on Scott street to Factory street, formerly Catherine street, Seventy-eight feet; thence southerly along said Factory street One hundred and ninety feet to Bank street; thence easterly on Bank street one hundred and twenty feet eight inches to the place of beginning."

The plaintiffs' claim is that as Factory street was never opened or laid out, the grantee had a right to occupy, enjoy and use for building or any other lawful purpose the one-half of the street abutting upon her property.

Hetty Gomez was the daughter of Harmon Hendricks, who conveyed the above-described tract (with others) to Solomon I. Isaacs, Uriah Hendricks and Henry Hendricks, as trustees, to hold it for the use of Hetty Gomez during her life, and to convey it to such person or persons as she, by her will, might designate and appoint. These trustees, Isaacs and Hendricks, in 1831, leased No. 5 Bank street to John R. Peters, who assigned the lease to Doughty, who, in 1834, assigned it to Alexander McLachlan. Attached to the lease is a map on which Factory street appears, with the words "right of cartway" written in, as if defining the right that the lessee was to have in the unopened street. About 1838, a fence across Factory street, closing it to travel, was standing, but it does not appear who put it up. The curbstones on Bank street curved inwards, as if intended to mark the corners of Factory street. In 1857, Alexander McLachlan, who occupied No. 5 Bank street, and a good deal of adjacent property, erected the dwelling No. 7 Bank street, on the land called Factory street. In 1865, Hetty Gomez having died, the defendant Horatio Gomez became trustee under her will. In 1873, Gratz Nathan, on the retainer of the trustee, began an action to eject McLachlan from No. 7 Bank street. Mr. Nathan did not push the suit, being doubtful of success, and in 1877, Horatio Gomez, as trustee, executed a conveyance to McLachlan, purporting to release on the part of the trust estate all claim to No. 7 Bank street. The consideration of that conveyance was a conveyance by McLachlan releasing to the trust estate whatever claim he had to so much of Factory street as lay between the north-

erly end of No. 7 Bank street and West Twelfth or Troy street.. McLachlan and his heirs remained in undisturbed possession until 1890, when Edgar J. Nathan brought against the heirs of McLach-- lan an action of ejectment in the name of Hart, one of the appoint- ees of Hetty Gomez. This suit resulted in a compromise by which the McLachlans sold the house No. 7 Bank street to certain descend- ants of Hetty Gomez, who paid therefor about $7,000. The inten- tion of the trustee, and of those who joined with him in the pur- chase, was that all the beneficiaries under the will of Mrs. Gomez, together with the heirs of those beneficiaries who had deceased, should acquire an interest in the property in proportion to their con- tributions to the purchase money; and an opportunity was given to Edwin Gomez to acquire on those terms an interest in whatever property rights were conveyed by the McLachlan heirs. Edwin Gomez had not the money to pay for such an interest, and insisted that nothing ought to be paid for the building that McLachlan had erected on No. 7 Bank street, because, as he contended, the land really belonged to the beneficiaries under Hetty Gomez's will, and McLachlan had no right to build the house upon it, since he knew, or ought to have known, that he was building on the land of another.

Upon these facts, the question arises whether the defendant was guilty of negligence in failing to recover No. 7 Bank street for the trust estate. He was negligent, if the right of the estate to the fee of No. 7 Bank street was clear beyond any reasonable question. I think that the dropping by Mr. Gratz Nathan of the suit he began would not excuse the inertness of the trustee, or extenuate his attempt in 1877 to relinquish the claim of the estate upon No. 7 Bank street if the title of the estate to the land were obvious and indisputable. But, it seems to me, that it cannot fairly be said that a man of good business judgment would not have thought it safer to compromise than to litigate the claim to the land. It cannot be said that the law is settled that the grantee of land bounded by an unestab- lished street, a street that never has had a moment of actual exist- ence, takes title to the middle line, with the right to build upon it, or to use it for any exclusive purpose of his own. Must he not keep the land open for light, air and access? Some one built a fence across Factory street at the north side of Bank street. There was

no proof that the trustees of Hetty Gomez, or any of their prede-
cessors in title, built the fence. There is a possibility that the city
of New York itself erected it. There is a supposition that, under
its police power, the city built the fence and then sold the land to
reimburse itself for its outlay. That supposition is not supported
by proof, but it is alleged that McLachlan, though his lease gave
him merely the right of cartway, asserted a title to the land,
arising out of the action of the city with respect to that fence.
Nineteen years or more after the erection of the fence, McLachlan
built the house, and then for eight years after the house was erected
the trustees of Hetty Gomez left him in undisturbed possession.
Then Horatio Gomez entered upon his duty as trustee. In 1873 he
retained an acute and experienced lawyer, Gratz Nathan, to bring
an action of ejectment against McLachlan, but Mr. Nathan, after a
careful examination of the case, deemed it wise to drop the suit.
It may be that if McLachlan had received the value of the build-
ing in 1877, he would have yielded up possession of the land as his
heirs did in 1890, when Edgar J. Nathan brought an action of eject-
ment against them. Mr. Edgar J. Nathan, a lawyer of ability, per-
sonally interested in the estate of Hetty Gomez, though dissatisfied
with the relinquishment by the trustee of all claim to No. 7 Bank
street, which he regarded as null and void, thought it the part of
prudence to pay for the building, in order to quiet the title of the
Gomez estate to the land. Taking all these things into considera-
tion, it seems to me that it cannot be said that the estate of Hetty
Gomez had a clear, indisputable title to No. 7 Bank street. It is
by no means certain that an ejectment suit would have resulted in
the trustee's favor, and, if the land had been recovered, there is a
question whether it could have been made a source of revenue,
inasmuch as it was set apart by Hammond for street uses, and it
could not, therefore, lawfully be utilized in any manner that would
diminish the *quantum* of light and air that it would furnish if
retained as a street. I, therefore, overrule the 12th objection of
the plaintiffs to the trustee's account, and decline to charge the trus-
tee with the value of the house and lot No. 7 Bank street, with
interest thereon from February, 1865.

The defendant, with the concurrence of the others who acquired
the interest of McLachlan's heirs, offered on the trial to admit the

plaintiffs, or any of them, to a share in 7 Bank street, on their contributing their proportional share of the sum paid to the McLachlans. Of that offer the plaintiffs are at liberty now to avail themselves, and a provision, assuring to them that opportunity, might be inserted in the final judgment to be entered herein.

The plaintiffs' nineteenth objection is as follows :

"The trustee is personally chargeable with the sum of $25,000, moneys lost to the estate by reason of the illegal, improvident and improper granting 21 years' renewal lease of lots 4 and 5 on map 2 on Commerce street, and said amount must be added to the income of the trust estate."

With respect to all of the property on Commerce street, except No. 7, there was a provision in the leases that were made by the trustees for Hetty Gomez in 1835 or 1836, to the effect that if, at the expiration of the term of forty-two years, the lessors or their successors should decline to execute a renewal for the further term of twenty-one years, they should pay to the lessee or his successors the value of the improvements then upon the land, but that such improvements should, at the end of the renewal term, belong to the lessors or their successors, if a renewal lease for twenty-one years were made.

With respect to No. 7 Commerce street, the lease, also made by the trustees for Hetty Gomez in 1850, provides that, at the expiration of twenty-one years, the buildings shall be purchased by the lessors at a fair valuation, in case a renewal lease for twenty-one years were not made, but there was an obligation and not a mere lessor's option to grant a renewal.

When these leases expired the defendant, in every case, executed a renewal. These renewals were for a rent amounting to five per cent per annum upon the appraised value of the land without the improvements thereon, and the lessee also agreed to pay the taxes during the term. The improvements became the property of the lessors at the expiration of the renewal leases.

The plaintiffs contend that it was wasteful and improvident to grant these renewals in view of the fact that the trustee could have bought the improvements at a low figure and then have leased the property at rents that would have added largely to the income of the estate. In answer to that it is urged by the trustee that he had

no money belonging to the estate with which the improvements could have been purchased, and that the law in force at the time did not permit him to mortgage the fee, or even the trust estate, for the purpose of buying the improvements. That the law did not, until 1882 (Chap. 275), authorize a mortgage by the trustee of the trust estate, is clear; and, as the trustee had no funds in hand, there is no way in which he could have bought the improvements with trust moneys. Besides, there is grave doubt as to whether it would have been wise for the trustee to grasp after an increase of the income by putting an incumbrance upon the *corpus* of the trust estate. Chancellor KENT expressed the opinion that it was hazardous to mortgage land for the purpose of raising money for its improvement. If the trustee had had power to raise money upon mortgage, it would, nevertheless, be better for the children of Edwin Gomez, the elder (who are plaintiffs), to get the improvements at the expiration of the renewal leases, as they will do, without cost to themselves, than to get the land incumbered by a mortgage. The income of their father might have been increased, but their own would be diminished, if the trustee had mortgaged the land, and he would then have been exposed to the accusation of having increased his own income and that of the holders of other life interests at the expense of those who are to succeed to the fee of the estate. I think the nineteenth objection of the plaintiffs should be overruled.

The twentieth objection of the plaintiffs is as follows: "The trustee must be personally charged with the sum of $25,000, moneys lost to the estate by the illegal, improvident and improper making of 21 years' renewal lease on lots 6 and 7 on map No. 2, on Commerce street, and said amount must be added to the income of said estate."

This objection must be overruled for the same reasons that have been given for overruling the nineteenth objection.

Though the objection is not found among the twenty-one filed by them, the plaintiffs insist that the defendant should be charged with $3,368, with the interest thereon, as the amount lost to the estate by his negligent and unbusinesslike management of No. 139 Mott street.

The property at No. 139 Mott street was let on a long lease, which expired in 1875. For that lease the defendant was not

responsible ; but from 1875 till 1888 he let the premises from year to year, and the plaintiffs contend that the rent he received for that period was more than $3,000 less than he could have obtained with proper diligence, energy and businesslike methods. The property was in a very dilapidated condition, the buildings being old, worn out and irreparable. In 1888 a tenant was found who agreed to take the property for the term of fifteen years, and to pay a much larger rent than that received subsequently to 1876. That tenant and his successors, with the aid of some of the appointees of Hetty Gomez, put substantial buildings upon the property, which yields to the lessee a rent large enough to make the lease command a bonus.

It may be that a more energetic man, with greater business capacity, would have found some way of getting a larger income, but it was not proved that in the period of depression that followed the panic of 1873, and which continued for about ten years, the property could have been let to a tenant who would improve it. The place was always occupied, but by a very low order of tenants, who were the only ones that would live in such wretched quarters. The plaintiffs contend that the trustee's omission to advertise and to employ real estate agents is proof of a neglect of ordinary business methods. There might be circumstances under which that point would be well taken, but in this case, considering that the premises were never vacant, that they always brought in a rent proportioned to their ruinous state, that for a long time it was improbable that in the lethargic condition of the market a tenant, able and willing to improve and to pay a larger rent, could be found, and that the power to lease for a term of years was doubtful, it would be a harsh rule that would pronounce the trustee negligent to a degree that should fasten upon him a liability for a loss that is at best speculative. I, therefore, overrule the objection.

The fourth objection of the plaintiffs is as follows : " The trustee must be charged personally with the sum of $2,563, and interest from April 1, 1875, moneys paid by the trustee for taxes and lost to the estate by failure to take security from Schmaelzlein, a tenant, or to take proper proceedings to collect, and the income of the estate must be increased by that sum."

Schmaelzlein, by his lease, dated April 5, 1871, covenanted to pay

the taxes on what is known as the Columbia Garden property. This covenant he did not perform, and the taxes were allowed to accumulate for the years 1871, 1872, 1873 and 1874, when they amounted to $2,563.15. These taxes were paid by the trustee after Schmaelzlein, who had defaulted in the payment of his rent, was dispossessed by summary proceedings. The money with which the taxes were paid was borrowed by the trustee from Mrs. Rosalie Nathan, one of the *cestuis que trustent,* upon the security of his own note for $2,500. This note, principal and interest (save the sum of $100), was paid by the trustee with moneys deducted from the income of the trust estate. The first payment of interest was charged in the account for November, 1875, and the last payment in November, 1885. At that time (November, 1885) only $100 of the principal remained unpaid. Edwin Gomez has been charged with one-sixth of the principal and the interest of the note to Mrs. Nathan, and enough to make up that one-sixth has been deducted from his share of the income from the estate. The question arises whether or not the trustee is chargeable with such gross neglect of duty that he should be compelled to bear the entire loss resulting from the failure to force Schmaelzlein to pay the taxes? Under the law then existing the tenant could not be dispossessed by summary proceedings for failure to pay the taxes. Ejectment, a comparatively slow action, was maintainable, and would have been effective. If the landlord, for the purpose of protecting his property from sale for taxes, pays taxes that the tenant has covenanted to pay, he can maintain an action against the tenant for the amount so paid. It is true that Schmaelzlein had spent a large sum in making improvements upon the property, and that the estate made a profit from his tenancy in spite of his neglect to pay the taxes; but yet it was the duty of the trustee to make an effort to enforce, by legal proceedings, if such were necessary, the tenant's covenant to pay the taxes. No such effort was made till the tenant had become insolvent. It seems to me reasonably certain that if an action of ejectment had been brought, or if the trustee had paid the taxes from time to time, as they accrued, and then brought actions for money paid, the estate would not have been compelled to borrow money with which to pay taxes. It was within the power of the trustee to withhold from the *cestuis que trustent* enough of the

income to pay the taxes annually. If he had done so, he might have gotten possession from Schmaelzlein, either by ejectment or by execution upon a judgment for money paid. It is by no means certain, however, that the *cestuis que trustent* would have been much benefited by that course, because their income would have been diminished every year by the amount needed to pay the taxes, and if the property had come back into the hands of the trustee, it is questionable whether a new tenant could have been found able to pay as large a rent as Schmaelzlein paid. Where no fraud or evil intent can be imputed to a trustee, it is not the policy of the law to swell the claim that his *cestuis* may have against him because of his mere inertness. As the tenant could not have been dispossessed by summary proceedings for failure to perform the covenant to pay taxes, the neglect of the trustee must have consisted either in his omission to bring ejectment or in the omission to pay the taxes out of the income and then sue for the amount so paid. As has been said, the action of ejectment would have given the property back to the trustee, a result that might or might not have been to the advantage of the estate. The trustee could not have paid the taxes without taking the amount of them from the annual income. If he had done that he would have diminished the income, but he might have recovered the amount from Schmaelzlein by suit, or the leasehold might have been sold under execution and bought in by himself, a proceeding of doubtful expediency. The *cestuis que trustent* actually received the full income, which they would not have received if the trustee had paid the taxes annually. When Schmaelzlein was finally dispossessed it was absolutely necessary for the trustee to raise money for the payment of the arrears of taxes, in order to protect the estate. If of the amount that he borrowed for that purpose so much of the principal as he deducted from the shares of the *cestuis*, together with the interest that he paid upon the note, be debited against him, as heavy a burden will be imposed upon him as equity permits. I am aware that whenever a trustee pays out money improperly it is the custom to charge him with interest, the same as if he retained in his own hands and refused to pay over the amount that he has wrongfully expended, but this is not such a case. The trustee did not pay out money wrongfully, nor did he retain it in his hands. A lack of vigilance and of energy

occasioned a loss to the estate, and the burden of that loss is thrown upon him, but to add interest for twenty years, when the good faith of the trustee is not impugned, and when, though he were negligent, it is questionable whether the earlier eviction of Schmaelzlein would not have been worse for the *cestuis que trustent* would be unwarrantable severity. Except Edwin Gomez, no one of the *cestuis que trustent* complained of the indulgence to Schmaelzlein, or of the borrowing of the money with which to pay the taxes. The amount actually deducted by the trustee from the share of Edwin Gomez on account of the principal and interest paid to Mrs. Rosalie Nathan, who advanced the money for the taxes, will be charged to the trustee and credited to Edwin Gomez's successor. With respect to the assertion of Edwin Gomez, that the trustee refused to accept Mr. Bernheimer as surety for Mr. Schmaelzlein, though Bernheimer was willing to become surety on the lease, my conclusion is that Mr. Gomez's memory is at fault. The testimony of Mr. Gratz Nathan, and of the trustee himself, convinces me that Edwin Gomez was utterly mistaken.

The fourth objection of the plaintiffs is sustained to the extent of charging against the trustee the amount deducted from the share of Edwin Gomez for the payment of principal and interest to Mrs. Nathan. That amount I find to be $532.60.

The plaintiff's seventh objection is as follows: "The trustee must be charged personally with the sum of $7,000 and interest from May 1, 1879, waste committed and moneys improperly and improvidently expended by him in alterations of Columbia Garden without authority, and the income of the estate must be increased by that amount."

In 1865, when the trustee first acquired the Greenwich avenue property, it was subject to lease, and was in a very dilapidated condition. In 1871 Schmaelzlein leased it for ten years at a large rent and agreed to erect a building on the property. He did build a structure suitable for saloon and summer garden purposes, at a cost of about $20,000. He was dispossessed for the non-payment of rent, and then the building, which consisted of a brick front, brick side walls, and a rear of glass and iron, came into the possession of the trustee. The chief object of Schmaelzlein was to make the place spacious and open that it might attract and accommodate as many

people as possible. It was fitted, therefore, for a public hall or place of entertainment, but not for dwelling or business purposes. It was used for a while for a *café chantant* or some such entertainment, and then was let to one Agnes O'Neill, who contemplated the establishment of a theatre on the premises. The city authorities deemed the building unsafe for theatrical uses whilst the rear was of glass and iron, and required that solid walls should be erected, and that other changes should be made with a view to stability and safety. These changes were made by the trustee at an expense of about $7,000. A part of them hardly came within the scope of reparation, and might fairly be called improvements. Ordinarily, a trustee is not allowed for improvements that he has made without authority, though he is always remunerated for his expenditures for proper repairs. All the *cestuis que trustent*, except Edwin Gomez, approved the trustee's course in preparing the building for use as a theatre. A building, the rear of which is of glass and iron, though it might be occupied for some such purpose as a drinking garden, is so unsuited to ordinary use as a dwelling or as a place of business, that it may without impropriety be called an unfinished house, and the contract and specifications show that a very large part of the expense incurred in complying with the orders of the building department was in reality nothing more than an outlay made in replacing with bricks and stone a shell of glass and iron. Except when ordinary judgment would condemn such a course, a trustee who completes an unfinished building so as to make it rent producing would be allowed for his expenditures, as he is allowed for repairs. But the trustee did go beyond the strict line of duty in making alterations that were useful for a theatre but not otherwise, and, therefore, is liable. It is somewhat uncertain what the cost of the work actually was, because the trustee did not charge the full amount against the estate. Again, the other *cestuis que trustent*, who all approved of the policy of improving the property, took upon themselves the burden of paying a part of the one-sixth of the expenses that would have fallen upon the share of Edwin Gomez. How much Edwin Gomez has actually paid (through deductions made by the trustee from his share of the income) can, however, be ascertained. After November, 1885, no deductions were made by

the trustee. The work was done in the autumn and winter of 1878, and whatever was paid by the *cestuis que trustent* must have been paid between the beginning of 1879 and the end of 1885. The trustee borrowed at various times, from Mrs. Rosalie Nathan, the sum of $2,500 and the sum of $3,000, and he also lent money of his own to the estate. Of the money borrowed from Mrs. Nathan the trustee repaid $2,943. This amount is the aggregate of all the deductions made by the trustee from the shares of the *cestuis que trustent* for the purpose of discharging the principal of both debts to Mrs. Nathan. Two thousand four hundred dollars of that sum of $2,943 has already been charged in this account against the trustee and in favor of Edwin Gomez, because of the neglect of the trustee to enforce the payment by Schmaelzlein of his taxes. Deducting $2,400 from $2,943, there remains a balance of $543, which is the amount of principal that the trustee paid on account of the money he borrowed for the alterations. Of that sum of $543 so paid, Edwin Gomez is entitled to one-sixth, say $90.50. The trustee, if liable for that principal sum, is also liable to Edwin Gomez for one-sixth of the deduction that he made from the income for the purpose of paying interest on the principal sum. Those deductions amount to $2,075, one-sixth of which is $345.83.

As Edwin Gomez had the full benefit of all the improvements that were made, and all the profit derivable from them, it would be inequitable to allow any interest upon the sum charged against the estate. I sustain the seventh objection to the extent of allowing Edwin Gomez (or his successors) against the trustee the sum of $436.33.

The eleventh objection of the plaintiffs is as follows: "The trustee must be personally charged with the sum of $500, lost to the estate by improper deduction from the rent of Tracy & Russell. * * * "

This objection is, I think, founded upon a misapprehension. The trustee did deduct $25 per year from the rent of Tracy & Russell for four or five years. This was done to avoid litigation, which was likely to arise from an encroachment unintentionally made by Schmaelzlein upon the land of Tracy & Russell when building the wall of the summer garden. That concession probably prevented litigation and a controversy with tenants whom the trustee was

desirous of retaining, and who soon after took a new lease at a high rent.   The objection should be disallowed.

The sixteenth objection of the plaintiffs is as follows : "The trustee must be personally charged with the sum of $15,000 and interest from February 1, 1885, moneys lost to the estate by leasing the property 97 and 99 Greenwich avenue to John Sharp at the rental of $1,750. a year, and the income of the estate must be increased by said amount."

This objection must be overruled.   There is no evidence to satisfy me that the trustee acted without ordinary prudence in making the lease to Sharp.   The reasons that he gave for doing so seem to me satisfactory.

My opinion as to whether or not Horatio Gomez is a proper and suitable person to continue as trustee, and whether he should be removed, having been required by the court, I beg leave to submit the following :

There is not a word in the testimony that reflects upon the integrity of Dr. Gomez.   No trustee ever had a clearer record.   He has never sought the slightest advantage to himself at the expense of his *cestuis que trustent*.   On the contrary, he has voluntarily assumed the burden when, through misadventure, loss has fallen upon the estate.   He seems to have been forbearing, generous and liberal in his dealings.   His reluctance to proceed more vigorously against Schmaelzlein was caused by his feeling that it would be unfair to dispossess a tenant who had placed valuable improvements upon the property, and who had paid his rent and meant to pay the taxes. He is not a pushing, driving, grasping man of business, and there are men who could doubtless have gotten more out of the estate, and who might perhaps have gotten a good deal more for themselves. All the *cestuis que trustent* except Edwin Gomez have had, and the survivors all have, absolute confidence in his honesty, and are satisfied with his management.   He is growing older, but is not incapacitated.   His judgment has, generally speaking, been good, and he has avoided litigation and the contracting of lawyers' bills.   He relinquished too easily the claim of the estate to 7 Bank street, but, in the end, the property came to the devisees without the risk and the expense of an action of ejectment.   His policy in letting the Commerce street property on ground leases instead of attempting.

to mortgage the land to get money to buy the buildings, was, I think, conservative and sound. I think that the *cestuis que trustent* are safer in his hands than they are likely to be in the hands of a substituted trustee. My opinion is that he ought to be retained. I am further of the opinion that the expenses of the accounting should be paid out of the trust estate and not by the trustee individually. As has been said, his honesty of purpose is beyond suspicion. On no occasion has he been guilty of an act that savors of bad faith.

He has used his own money at times to save the *cestuis que trustent* from loss of income. His *cestuis que trustent*, with the single exception of Edwin Gomez, have uniformly approved of his management, and have favored his side of the controversy on this accounting. It is true that he has never applied to the court for a judicial settlement of his account, and that he has taken the position that the quarterly statements that he rendered to his *cestuis que trustent* were of themselves a sufficient accounting. It is true that Edwin Gomez was compelled to bring this action in order to compel an accounting before the court, but the testimony taken by me does not show that Dr. Gomez had any reason to fear or to refuse a judicial settlement of his accounts. He doubtless thought a judicial settlement unnecessary and expensive. It is likewise true that, though the correctness of his figures has not been disputed, he has been held liable for negligence respecting Schmaelzlein's taxes, and also for making improvements which, though beneficial to the estate, were beyond his functions as trustee. Most of the charges against him have failed. Taking all these things into consideration, I am of the opinion that the expenses of this accounting should be paid out of the trust estate.

The accounts of the trustee, as presented, I find to be in all respects just and true with these two exceptions, namely:

*First.* That he should be charged with $532.60, the one-sixth of principal and interest that he paid out of the trust estate to Mrs. Rosalie Nathan, for moneys lent by her to pay the taxes that Schmaelzlein should have paid, and this sum of $532.60 should be paid to the plaintiffs.

*Secondly.* That the defendant should also be charged with the further sum of $436.83, the one-sixth of the principal and interest

that he paid out of the trust estate to Mrs. Rosalie Nathan, for moneys lent by her to pay for improvements on the Columbia Garden property, and this last-mentioned sum should, like the other, be paid to the plaintiffs.

In every other matter and respect the accounts of the trustee as presented should be approved.

I respectfully return herewith the testimony and evidence taken before me, together with the accounts as rendered by the trustee.